Judge Edwin A. Lombard
|,The defendant, Richard Abbott appeals his conviction and sentence for second degree battery, a violation of La. Rev. Stat. 14:34, arguing that the trial court erred in denying his motion for a new trial. After review of the record in light of the applicable law and arguments of the parties, the judgment of the trial court is affirmed.

Relevant Facts and Procedural History

On the evening of July 18, 2015, the defendant was involved in an altercation outside the Three-Legged Dog, a French Quarter bar. The defendant was commissioned to carry a weapon as a state fire marshal at the time of the incident and, as an arson investigator, was assigned a state-owned, explosive-sniffing service dog. Prior to the altercation, the off-duty (but armed) defendant was drinking at the bar, accompanied by his off-leash service dog. The defendant was arrested and, on July 24, 2015, a grand jury returned an indictment charging him with one count of aggravated battery and one count of possession of a firearm while on the premises of an alcoholic beverage outlet. At his arraignment on August 3, 2015, the defendant pleaded not guilty to both counts and, on September 4, 2015, the State entered a nolle prosequi on the second count. On September 8, 2015, the trial' court granted the defendant’s motion to waive his right to a trial by jury.
On January 29, 2016, just prior to trial, the defendant filed a motion pursuant to La. Code Crim. Proc. 781,[1] seeking a charge on the use of force or violence in *849 defense the defendant filed a motion to instruct on the justifiable use of force or violence in defense, citing La. Rev. Stat. 14:19(A)(1)(a),(C) and (D).[2] On February 17, 2016, the defendant filed a second motion seeking a charge on the burden of proof pertaining to a justification defense. However, the record before the court does not reflect a trial court ruling on the defendant’s motions to instruct, nor does -the record indicate that a defense objection to the trial court ruling or failure to rule on the defendant’s motions.
The following evidence was adduced at the two-day trial which began on January 29, 2016:
Sergeant Andrew Packer of the New Orleans Police Department (NOPD) testified that the night of July 18, 2016, he was working a paid detail in the French Quarter when, at 8:36 p.m., he was dispatched to an aggravated battery in progress |aat the Three-Legged Dog. At the scene, Sergeant Packer interviewed the victim, Curtis . Courtney, and several witnesses. He observed open lacerations on Mr. Courtney’s head and the defendant, who appeared intoxicated, seated at the bar. After learning that defendant struck Mr, Courtney on the head with a handgun, he placed the defendant under arrest, administered Miranda warnings, and recovered a loaded .357 magnum revolver from the defendant’s rear pocket. Sergeant Packer observed that the defendant’s state-issued, explosive-sniffing, service dog was not on a leash and was located in another room of the bar.
On cross-examination, Sergeant Packer related Mr. Courtney’s version of events: Mr. Courtney and his friend were outside the bar when the defendant approached them and asked if they knew the location of his dog. They responded that they did not know and the defendant began beating Mr. Courtney on the head with a pistol. Sergeant Packer testified that the two bartenders verified that the defendant had been consuming alcohol and that the defendant was too intoxicated to interview, although Sergeant Packer believed the defendant understood the Miranda warnings when given. Sergeant Packer conceded that the defendant was not given a breathalyzer test and that the intake report narrative incorrectly identified the two bartenders as male.
NOPD Detective Christopher Laborde testified that he was at the police station on July 18, 2016, when Sergeant Packer arrived with the defendant. Detective La-borde removed all items bearing the identification of the state fire marshal’s office from the defendant’s wallet and then, with another officer, relocated to the Three-Legged Dog to retrieve the video surveillance footage and [¿take photographs of Mr. Courtney’s injuries. Detective La-borde related that, prior to their arrival, *850 the manager of the bar had been instructed by Sergeant Packer to recover the video surveillance of the incident from the bar’s video cameras and to download the footage to a “jump drive.”
Detective Laborde narrated the video surveillance tape with his observations as it was played in open court. According to Detective Laborde’s description, at 8:31 pm the defendant was seated at the bar and Mr. Courtney was outside with an unidentified dog. Detective Laborde identi* fled another man in a dark shirt as Marshal Edwards, the man who initially apprised the defendant that his service dog was absent from the bar. The defendant pushed Mr. Edwards and when Mr. Courtney attempted to break up the fight, the defendant hit Mr. Courtney with an object he retrieved from his waistband. Detective Laborde testified that the surveillance video corroborated the version of events related to him by Sergeant Packer earlier that evening. Detective Laborde stated that defendant declined to be interviewed.
On cross-examination, Detective- La-borde conceded that Sergeant Packer selected the. surveillance footage to collect, consisting of twenty minutes of footage from only three of the twelve camera angles. He also conceded that, to his knowledge, Mr. Courtney declined to seek medical attention for his injuries, Detective Laborde acknowledged that the incident report incorrectly identified the two bartenders as male and did not include any indication that the defendant was “too drunk.. .to question.”
Mr. Edwards testified, stating he was a regular patron of the Three-Legged Dog. On the evening of July 18, 2015, he went to the bar to “hang out” with his |Bfriehd, Mr. Courtnéy. When he arrived, he and Mr. •Courtney went outside to smoke a cigarette and were approached by the defendant. According to Mr. Edwards, the defendant “thought that we had taken his dog and hidden it in the back and then told him it was dead,” but did not offer an explanation as to why the defendant made such an accusation. Mr. Edwards stated that the defendant appeared “extremely intoxicated” 'and when he pulled'out his gun, he (Mr. Edwards) and Mr. Courtney began to back away. The defendant then reached out to grab Mr. Edwards by the throat. In response, Mr. Courtney “grabbed” the defendant who began hitting him (Mr. Courtney) with his gun. When asked to explain what he meant when he.said Mr. Courtney “grabbed” the defendant, Mr. Edwards stated that he didn’t see what happened, but he heard Mr. Courtney say, “hey,. stop.” Mr. Edwards described the gun as a “little black revolver,” but was unable to positively identify the weapon in court. Mr. Edwards stated that he was not injured in the altercation, but that because the defendant tried to “chase [him] around the bar” when he attempted to go inside, he remained outside to wait for the police to arrive.
On cross-examination, Mr. Edwards testified that at no time did he have his hands in his pockets, nor did the defendant instruct him to remove his hands from his pockets. The surveillance footage was replayed for Mr. Edwards who stated that the images were too blurry for him to decipher, although he was able to identify his girlfriend in the video and agreed that, after the police had been called, the video showed him handing his backpack to his girlfriend, who sprinted out of the bar and down the street and did not reappear on the video. Mr. Edwards denied that any weapons or drugs were contained in his backpack, claiming that he was giving his girlfriend his car keys.
| (jBIake Branch, one of the bartenders working at the Three-Legged Dog on the night of the incident, testified that the *851 defendant entered the bar at 2:30 pm, introduced himself and stated that he was new to the neighborhood. Ms. Branch recalled that the defendant began drinking at 2:30 pm and continued until he was arrested around 9:00 pm and that everyone at the bar was intoxicated except Mr. Edwards, who generally drank orange juice. She testified that both the defendant’s and Mr. Courtney’s dogs were at the bar but that the defendant’s dog was off-leash and he (the defendant) did not appear to be watching his dog, as it was roaming around the bar. Ms. Branch testified that she did not witness the actual altercation but observed Mr. Courtney holding his head shortly thereafter. While the defendant and Mr. Edwards were still outside engaged in a verbal argument, Ms. Branch approached Mr. Courtney, observing three bumps on his head. She stated that eventually everyone returned inside the bar while waiting for the police to arrive. When the police arrived, Ms. Branch witnessed “a small silver revolver” being removed from the defendant’s pocket.
On cross-examination, Ms. Branch conceded that she gave the defendant’s private investigator a written statement on September 16, 2015, indicating that the defendant had not been drinking excessively. She stated that, as a licensed bartender, she did not find the defendant too intoxicated to be served, although she could not recall specifically what he had been drinking, other than beer and shots of alcohol.
Mr. Courtney testified that he lives across the street from the Three-Legged Dog and is a regular patron. On the night of the incident, he arrived at 7:30 pm and observed the defendant, who he had never met before, sitting at the bar drinking a beer while his dog freely roamed around the premises. The two men |7engaged in a brief conversation and Mr. Courtney informed the defendant that his dog had just exited the bar. When asked whether the defendant appeared to be drunk, Mr. Courtney responded that “he looked giddy.” He testified that, at some point, he (Mr. Courtney) was outside smoking a cigarette and drawing on the sidewalk with chalk but could not recall the incident or the events leading up to the incident and was only able to piece together what happened based on information from his friends and what he discerned from the video footage. Mr. Courtney stated that he suffered three lacerations to the back of his head which bled for hours and that, although he declined medical treatment on the night of the incident because he could not afford ambulanee charges, he sought medical treatment the following morning. Mr. Courtney recalled consuming four bottles of Coors Light prior to the incident and declared that he was not in possession of any weapons when the incident occurred. He testified that, at the time of the incident, he was not aware that the defendant was a law enforcement officer or that the defendant was in possession of a gun.
The defendant’s private investigator, Emily Beasley, testified, but the extent of her testimony was a description of the layout of the bar and the location of the video surveillance cameras. She stated that she attempted to recover the remaining surveillance footage the police had not requested from the bar manager, but it no longer existed.
The defendant testified that, as a state fire marshal, he was commissioned to carry a weapon and regularly participated in the special firearms training required of all law enforcement officers. He was a fifteen-year U.S. Army veteran and had been deployed for combat duty in the 1991 Persian Gulf War, where he was wounded by an exploding RPG. After his father passed *852 away, he moved to | ^Louisiana to be closer to his family and began employment as an arson investigator with the fire marshal service; he was eventually promoted to captain and relocated to the New Orleans area. He was also issued a state-owned, explosive-sniffing, service dog, a veteran of three tours in Afghanistan with the U,S. Marines.
The defendant testified that on the day of the incident he was new to the French Quarter neighborhood and, because his cable service was not yet connected, he stopped into the Three-Legged Dog at 2:00 pm to watch television. During his afternoon visit, he was advised by the bartenders that the bar was dog-friendly and invited to return later with his dog to attend a crawfish boil that evening. The defendant testified that he left the bar' at 3:30 to run' errands and walk his ‘dog, eventually returning with his dog later that evening.
With the surveillance footage playing, the defendant narrated the details in the video supporting his version of events. At 8:24 pm, Mr. Courtney was outside with his own dog while the defendant’s dog followed one of the bartenders to the ice machine. The defendant asserted that he had viewed the video “probably 100” times and at no point did it show his dog outside of the bar. According to the defendant, at 8:30 pm, Mr. Courtney called to him from outside the bar and said, “Hey, hey, fire marshal, your dog just got hit by a taxi out here.” Because his dog was not in his immediate sight, the defendant exited the bar to , investigate. He questioned Mr. Courtney who repeatedly told him that the dog had been , hit by a taxi, saying “If that dog is so special, you need to keep a better eye on it,” Then, according to the defendant, Mr. Edwards approached, poking him- in the chest and telling him that, “[his] dog was dead, and if [he] didn’t get out of their face, [he] would be dead too.” The defendant then “strong arm-barred”- Mr. Edwards, in the “brachial plex.” The defendant claimed that, as.Mr. Edwards began walking | nbackward, he reached both of his hands into his pockets. Identifying himself as a law enforcement officer, the defendant commanded Mr. Edwards to remove his hands from his pockets but Mr. Edwards continued to walk backward and the defendant heard a female say, - “get his gun!” The defendant then turned and observed Mr. Courtney reaching toward his (the defendant’s) waistband where his gun was holstered.
The defendant stated that, at that point, he was afraid because he was surrounded by three people (Mr. Edwards, Mr. Courtney, and Mr. Edwards’ girlfriend) with Mr. Courtney.attempting to seize'his gun. He attempted to shield his gun from Mr. Courtney’s reach but Mr. Edwards restrained his (the defendant’s) other arm. The defendant took his. gun out of his holster and secured it in his palm to prevent it from falling into Mr. Courtney’s possession or sliding into the public street. Because Mr. Courtney continued to reach forward, putting his hands on defendant’s shoulders, the'defendant struck him (Mr. Courtney) oh the head with the pistol, repeatedly instructing him to “get down.” After the defendant struck him three times,. Mr. Courtney complied and went down onto his knee. Once Mr. Courtney acquiesced, the defendant (no longer feeling threatened) lifted him up and led him inside the bar to wait for the police.
The defendant continued to describe the video frame by frame, pointing out that Mr. Edwards attempted to hand an.unidentified object to the bartender (who refused. to take it) .and then put the item in his backpack and handed it to his girlfriend who sprinted all the way down the *853 street and out of view of the video cameras.
Introducing his credit card statement indicating that a payment in the amount of $37.75 was made to the Three-Legged Dog on July 18, 2015, the defendant | ^conceded he consumed a couple of alcoholic drinks, but also asserted that he bought several drinks for others at the bar, including Mr. Courtney, both of the bartenders, and other patrons. He related that, after the incident, he resigned from his fire marshal position because media coverage of the incident would undermine the credibility of the law enforcement program.
On cross-examination, the defendant asserted that when he arrived at the bar the second time with his dog, he asked the bartender if it would be permissible to allow his dog off of its leash. The bartender responded that it would be fine as long as the bar was not crowded. The defendant claimed he had only consumed four beers the entire day, which included his first visit to the bar earlier in the afternoon, and that throughout the course of his conversations with other bar patrons, he revealed that he was a fire marshal and that, because fire marshals are law enforcement officers, he was armed at all times. Although he did not remove his gun or show it to anyone in the bar, the defendant believed everyone in the bar was aware of his occupation and that he was armed.
The defendant agreed with the district attorney’s assessment of police use-of-force training procedures which required officers to control their emotions when meeting force with force but, refuting the district attorney’s suggestion to the contrary, asserted that he was not angry or emotional at the time of the incident, only rather confused when Mr. Edwards and Mr. Courtney told him his dog had been hit by a taxi because his highly trained service dog would not exit a building unless directed. He asserted that, although the video footage showed the dog wandering around the bar, the dog returned to defendant every few minutes to “check with [him]” and, because it did not make sense that his dog wandered In outside and down the street, he believed that someone had intentionally hidden his dog or removed it from the bar.
The questions and testimony then shifted to police use-of-force training and the defendant explained that he was trained to stay one level of force above the force being met. Thus, once he felt that Mr. Courtney was no longer a threat to him, he placed the gun in his back pocket. The defendant testified that he did not violate fire marshal department policy by entering an establishment that serves alcohol with a service dog while armed. Finally, he admitted that twenty .years earlier, he had been charged with a misdemeanor firearm violation in New York after hunting with “Army buddies” but explained that, at the time, he had been unaware that it was illegal to possess any type of gun in New York, including a hunting rifle.
At the conclusion of the two-day trial on February 5, 2016, the trial court took the matter under advisement. On February 17, 2016, the defendant filed a second motion to instruct, citing State v. Wells, 2014-1701 (La. 12/8/15), 209 So.3d 709, for the proposition that the State should bear the burden of proving beyond a reasonable doubt that the defendant’s conduct was not justified. On February 18, 2016, the trial court returned a responsive verdict of guilty of second degree battery and ordered a pre-sentence investigation. Again there is no indication in the record that the trial specifically ruled on the defendant’s motion or that the defendant objected to the trial court ruling or failure to rule.
*854 On March 8, 2016, the defendant filed his first motion for a new trial and a motion for a post-verdict judgment of acquittal, both of which the court denied. On May 31, 2016, defendant filed a second motion for a new trial based on newly discovered evidence and, on June 28, 2016, after a lengthy hearing, the trial court | ^denied defendant’s motion for a new trial and sentenced the defendant to five years at hard labor, suspended, and five years active probation, on the condition that defendant participate in Veterans Court and submit to weekend incarceration for twenty-five weekends.

Assignment of Error

As his sole assignment of error, the defendant asserts that the trial court failed to rule on his proposed written instructions pursuant to La. Code Crim. Proc. art. 781 and, thus, failed to apply the proper law in reaching its verdict. Accordingly, the defendant argues that his motion for a new trial should have been granted because the verdict is contrary to the law and evidence.

Applicable Law

La. Code Crim. Proc. 851 provides in pertinent part:
A. The motion for a new trial is based on the supposition that injustice has been done the defendant, and, unless such is shown to have been the case the motion shall be denied, no matter upon what allegations it is grounded.
B. The court, on motion of the defendant, shall grant a new trial whenever any of the following occur:
(1) The verdict is contrary to the law and the evidence.
(2) The court’s ruling on a written motion, or an objection made during the proceedings, shows prejudicial error.
(5) The court is of the opinion that the ends of justice would be served by the granting of a new trial, although the defendant may not be entitled to a new trial as a matter of strict legal right.
“When the allegations of a motion for new trial are not supported by proof, a trial judge properly overrules the motion. Allegations raised in the motion alone are not sufficient, as a defendant has the burden to hsshow that an injustice has been done to him.” State v. McKinnies, 2013-1412, p. 11 (La. 10/15/14), 171 So.3d 861, 870.
“A judge in a bench trial is not required to charge himself on the applicable law, since he is presumed to know it, unless one of the parties timely requests that he do so and provides him with the requested written charges.” State ex rel. D.R., 2010-0404, p. 5 (La. App. 4 Cir. 11/10/10), 51 So.3d 844, 848 (quoting State v. Pizzalato, 93-1415 (La. App. 1 Cir. 10/7/94), 644 So.2d 712, 715). In a bench trial, a request for the judge to charge himself before the verdict as to the disputed issue of law, and to object if he refuses to give special charge correctly stating the law, is the method of preserving the issue for appeal. Id.
“When a case is tried without a jury, the state or the defendant may request the court to charge itself in accordance with written charges presented to the court.” La. Code Crim. Proc. art. 781. Pursuant to La. Code Crim. Proc. 807, “a requested special charge shall be given by the court if it does not require qualification, limitation, or explanation, and if it wholly correct and pertinent.” (emphasis added).
La. Rev. Stat. 14:19 provides in part:
(A)(1)(a) The use of force or violence upon the person of another is justifiable .,. [wjhen committed for the purpose of preventing a forcible offense against the person or a forcible offense or trespass against property in a person’s lawful possession, provided that *855 the force or violence used must be reasonable and apparently necessary to prevent such offense.
⅝ ⅜ ⅜
(C) A person who is not engaged in unlawful activity and who is in a place where he or she has a right to be shall have no duty to retreat before using force or violence as provided for in this Section and may stand his or her ground and meet force with force.
(D) No finder of fact shall be permitted to consider the possibility of retreat as a factor in determining whether or not the person who used force or violence in defense of his person [14or property had a reasonable belief that force or violence was reasonable and apparently necessary to prevent a forcible offense...
However, La. Rev. Stat. 14:21 provides that
A person who is the aggressor or who brings on a difficulty cannot claim the right of self-defense unless he withdraws from the conflict in good faith and in such a manner that his adversary knows or should know that he desires to with draw and discontinue'the conflict.
There is “a ‘presumption of regularity' in judicial proceedings,” State v. Evans, 96-1139, p. 6 (La.App. 4 Cir. 6/17/98), 715 So.2d 604, 607, such that, in the absence of some evidence that the trial court applied an incorrect standard, it must be presumed that it applied the [correct] standard.” State v. Lewis, 97-2854, p. 35-36 (La.App. 4 Cir. 5/19/99), 736 So.2d 1004, 1025.

Standard of Review

Appellate review of the ruling of a trial court on a motion for a new trial shall be invoked only to consider error of law. La. Code Crim. Proc. art. 858; McKinnies, 2013-1412, p. 9, 171 So.3d at 869. A reviewing court will attach great weight to the exercise of a trial court’s discretion; however, an abuse of that discretion will be considered an error of law. McKinnies, 2013-1412, p. 9, 171 So.3d at 869.

Errors Patent

A review of the record reveals no errors patent.

Discussion

Before discussing the defendant’s assignment of error, we note there are a number of problems with the record before the court. The trial court set the return date on this appeal for September 13, 2016, and there is nothing in the record (or | lfithe trial court docket sheet) to indicate that a request for an extension of that return date was requested or granted. See La. Code Crim. Proc. art. 916(1) (trial court retains jurisdiction to extend return date of appeal). Nonetheless, the appeal was not lodged in this court until January 6, 2017, see La. Code Crim. Proc. art. 917 (“clerk of trial court shall prepare record on appeal and lodge it with appellate court on or before the return date or any extension thereof.”); see also Uniform Rules-Courts of Appeal, Rule 2-2.3 (record shall be filed on or before date fixed for return or any extension granted).
The defendant’s failure to adhere to set deadlines continued in this court with the filing of his appellate brief. On January 6, 2017, the defendant was notified that his brief was due on January 31, 2017. On January 24, the defendant filed his first motion for an extension of time to file his appellate brief. This court granted the motion with a new due date of March 2, 2017. On March 1, 2017, the defendant filed a second motion for extension of time to file his appellate brief. This court again granted the motion, extending the time until April 4, 2017. On March 29, 2017, the defendant filed a third motion for extension of time. This court denied the motion, ordering that the defendant’s appellant brief be filed on or before April 4, 2017. Instead, the defendant electronically filed *856 his brief on April 6, 2017. This failure to timely file a brief is sanctionable, see Uniform Rules-Courts of Appeal Rule 2-12.12, but in the interest of judicial efficiency we have determined the defendant’s appeal on the merits.
As his sole assignment of error, the defendant asserts that the trial court failed to rule on his proposed written instructions pursuant to La. Code Crim. Proc. art. 781 and, thereby, failed to apply the proper law in reaching its verdict. |) (Accordingly, because the verdict is contrary to law and evidence, the defendant argues that his motion for a new trial should have been granted.
There is nothing in the record before this court indicating whether the trial court ruled on either of the defendant’s motions for special instructions or that the defendant objected to the trial court ruling or failing to rule. Yet on March 8, 2016, the defendant filed his first motion for a new trial based on La. Code Crim. Proc. 851(B)(2) and (5), arguing that the failure of the trial court to rule on defendant’s proposed special instruction that the state bore the burden of proving beyond a reasonable doubt that defendant was not justified in his use of force against the victim in self-defense, constituted prejudicial error. The trial court minutes reflect that the defendant appeared for a hearing on the motions for new trial and post-verdict judgment of acquittal (both denied) but there is nothing to indicate what took place at the hearing, the reasons for the court’s denial of defendant’s motions, or whether defendant filed a contemporaneous objection to the denial of the motion.[3] On May 31, 2016, the defendant filed his second motion for a new trial based on newly discovered evidence. After a lengthy hearing on June 28, 2016, the defendant’s second motion for a new trial was denied.
Notably, the defendant’s appeal appears to be based on the denial of the defendant’s first motion (filed on March 8, 2017) for a new trial. However, although the burden is on the defendant to prove the denial of his motion for a new trial constituted an injustice to him, the defendant points to no evidence (other than the trial court’s failure to acquit him) indicating that the trial court misconstrued 117the law or that the defendant was prejudiced by the trial court’s failure to rule on his proposed charges. The defendant does not address the absence in the record of any evidence indicating if, and how, the trial court ruled on his proposed charges, nor does the defendant address the absence of any record evidence that he objected to the trial court ruling or failure to rule on his proposed charges. Rather, the defendant argues that, had the trial court evaluated the evidence under the correct law, it would have found defendant not guilty and, therefore, because the trial court found the defendant guilty (albeit of a lesser offense than that charged), it must have operated under a misunderstanding of the law applicable to the case. This argument is circuitous and without merit.
Given the “presumption of regularity” applied to judicial proceedings and in the absence of any evidence to the contrary, we presume that the trial court applied the correct law in reaching the verdict. See Evans and Lewis, supra. Notably, the trial court is required to give special charges only “if [they are] wholly correct and perti *857 nent” and, in this case, the instructions proposed by the defendant were neither “wholly correct or pertinent.”
With regard to the proposed justification instruction, the State presented eyewitness testimony by which, if found credible by the trier-of-fact, would tend to establish that defendant acted as the aggressor and, therefore, pursuant to La. Rev. Stat. 14:21, cannot claim self-defense. Thus, if the trial court found the defendant acted as the aggressor, the defense of justification was unavailable and, thus, not pertinent. As such, the trial court’s refusal to consider an instruction on an unavailable defense cannot be prejudicial.
11sWith regard to the defendant’s second proposed instruction, that the burden was on the State to prove that the defendant was not justified in his actions, the defendant proposed the following:
If you find that the defendant has raised the defense that his conduct was justified, the State must prove that the defendant’s conduct was not justified. Remember the State bears the burden of proving the guilt of the defendant beyond a reasonable doubt. See generally: State v. Wells, 2014-1701 (La. 12/8/16); 2016 La. Lexis 2531, [209 So.3d 709].
However, Wells does not support the proposition that the burden is on the State to prove that the defendant did not act justifiably. The issue in Wells is whether a jury could consider the defendant’s duty to retreat in determining whether he acted in self-defense in a homicide case and whether the defendant could claim justification as a defense at all if the homicide occurred while the defendant was involved in illegal activity. Most notably, the passage cited by the defendant in his proposed instruction was not the holding but, rather, was taken' from the statement of facts outlining the jury charges that were given in the trial court. Accordingly, Wells is not authoritative support for defendant’s proposed instruction. Moreover, this court has consistently declined to settle definitively on the issue of which party bears the burden of persuasion in proving self-defense in non-homicide cases. State v. De Gruy, 2016-0891, p. 18-19 (La.App. 4 Cir. 4/5/17), 215 So.3d 723.[4] Accordingly, it was within the trial court’s discretion to |infind that the proposed instruction submitted by the defendant, citing Wells as authority, was neither “wholly correct or pertinent” and, thus, not applicable to this case.
*858 In addition, the defendant argues that the trial court erred in failing to grant his motion for a new trial because the verdict is contrary to the law and evidence.[5] The defendant failed to present this argument to the trial court in either of his motions for a new trial, however, and it is axiomatic that this court does not consider arguments raised for the first time on appeal. Moreover, even construing this claim as one of insufficient evidence, the defendant’s argument is without merit.[6] The relevant question in a review of the sufficiency of the evidence is whether, after viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). “Under the Jackson standard, the rational credibility determinations of the trier of fact are not to be second guessed by a reviewing court.” State v. Williams, 2011-0414 p. 18 (La. App. 4 Cir. 2/29/12), 85 So.3d 759, 771. Further, “a factfinder’s credibility determination is entitled to great weight and should not be disturbed unless it is contrary to the evidence.” Id.
In this case, according to defendant’s own testimony and the argument in his appellate brief, his justification defense stemmed from his fear of being disarmed by Mr. Courtney. A rational fact-finder could have reasonably found that, once the defendant secured his gun in the palm of his hand (as he asserted he did in his trial testimony), his continued beating of Mr. Courtney’s head with the gun was an unreasonable use of force and was unneces *859 sary to prevent the victim from disarming him.
Also, as previously discussed, the State also presented eyewitness testimony from the victim’s friend, Mr. Edwards, identifying the defendant as the aggressor. Consequently, even if the burden of proof lay with the State in showing the defendant did not act in self-defense, a rational fact-finder could have chosen to believe the eyewitness testimony, as well as the video surveillance evidence, to |21find that the defendant was the aggressor. Accordingly, viewed in the light most favorable to the prosecution, the evidence is sufficient to convince a rational factfinder that the State proved beyond a reasonable doubt that defendant committed second degree battery.

Conclusion

The defendant’s conviction and sentence are affirmed.
AFFIRMED.
BELSOME, J., CONCURS IN THE RESULT

. La. Code Crim. Proc. 781 provides that "[w]hen a case is tried without a jury the state or the defendant may request the court to charge itself in accordance with written charges presented to the court. The requested charges shall be governed by the rules of procedure relative to requested charges in jury cases.”

. La. Rev. Stat. 14:19 provides in part:
(A)(1)(a) The .use of force or violence upon the person of another is justifiable ... [w]hen committed for the purpose of preventing a forcible offense against the person or a forcible offense or trespass against property in a person’s lawful possession, provided that the force or violence used must be reasonable and apparently necessary to prevent such offense.
(C) A person who is not engaged in unlawful activity and who is in a place where he or she has a right to be shall have no duty to retreat before using force or violence as provided for in this Section and may stand his or her ground and meet force with force.
(D) No finder of fact shall be permitted to consider the possibility of retreat as a factor in determining whether or not the person who used force or violence in defense of his person or property had a reasonable belief that force or violence was' reasonable and apparently necessary to prevent a forcible offense...

. It is problematic whether a contemporaneous objection was necessary to preserve the issue for appeal. See State v. Lewis, 97-2854, p. 36 (La.App. 4 Cir. 5/19/99), 736 So.2d 1004, 1025 (although trial court applied incorrect standard for ruling on the motion for a new trial motion, the defendant failed to contemporaneously object and, thus, failed to preserve this error for appellate review); but see La. Code Crim. Proc, 841(B) ("The requirement of an objection shall not apply to the court’s ruling on any written motion.”)

. In State v. Cheatwood, 458 So.2d 907, 911 (La. 1984), the Louisiana Supreme Court held that "In reviewing a conviction in which the defendant offered evidence tending to establish the affirmative defense of justification, an appellate court must determine whether a rational trier of fact could have concluded by a preponderance of the evidence, viewed in the light most favorable to the prosecution, that defendant’s [conduct was justified].” In State v. Fluker, 618 So.2d 459, 462 (La. App. 4 Cir. 1993), this court recognized that "in a homicide case, the State bears the burden of proving that the killing was not committed in self-defense." However, "in a non-homicide situation, the defense of justification requires a dual inquiry, namely: an objective inquiry into whether the force used was reasonable under the circumstances; and ⅝ subjective inquiry into whether the force was apparently necessary.” Id. After discussing the division of the Louisiana courts on the issue, this court stated that it "has therefore never adopted which party has what burden of proof when the defendant raises a claim of self-defense in a non-homicide case.” Id. at 463. Without going so far as to definitively hold it as a rule, the Fluker court opined that the burden should be on the state in both homicide and non-homicide cases. Id. In State v. Wischer, 2004-0325, pp.8-9 (La. App. 4 Cir. 9/22/04), 885 So.2d 602, 606-07, however/this court acknowledged the dual inquiry discussed in Fluker, but expressly adopted the holding in Cheatwood, that the defendant bore the burden of proving justification by a preponderance of the evidence. In State v. Jefferson, 2004-1960, pp. 10-11 (La. App. 4 Cir. 12/21/05), 922 So.2d 577, 588, this court ac *858 knowledged the split in the Fluker and Wischer decisions but declined to resolve the conflict, finding that under the more stringent standard, the evidence viewed in a light most favorable to the prosecution was sufficient to prove beyond a reasonable doubt that the defendant did not act in self-defense. Thereafter and until present, this court has consistently declined to settle the controversy. De Gray, 2016-0891 p. 8; State v. Rouser, 2014-0613 pp. 6-7 (La. App. 4 Cir. 1/7/15), 158 So.3d 860, 866-67; State v. Jones, 2012-0510, p. 11 (La. App. 4 Cir. 6/12/13), 119 So.3d 859, 866; State v. Boudreaux, 2008-1504, p. 32 (La. App. 4 Cir. 9/29/10), 48 So.3d 1144, 1162.

. The defendant makes this argument in his brief as an extension of his previous arguments: that the verdict is contrary to the law and evidence because the evidence proves defendant acted in self-defense and, but for the trial court’s failure to consider his defense of justification or apply the appropriate burden of proof, he should have been found not guilty.

. In State v. Martin, 2013-0115, pp. 11-13 (La. App. 4 Cir. 12/4/13), 131 So.3d 121, 129, this court described the law as follows:
"An assignment of error based on the refusal of the trial court to grant a new trial on grounds that the verdict was contrary to the law and evidence presents nothing for appellate review.” State v. Gray, 351 So.2d 448, 461 (La. 1977). However, in State v. Guillory, 10-1231, pp. 3-4 (La. 10/8/10), 45 So.3d 612, 615, the Supreme Court determined that a grant or denial of a motion for new trial pursuant to La. [code Crim. Proc. art.] 851(5) presents a question of law that is subject to appellate review and is reviewed for abuse of discretion. In State v. Collins, 10-1181, pp. 11-12 (La. App. 4 Cir. 3/23/11), 62 So.3d 268, 275, this Court noted that it was “unclear whether Guillory is limited to motions filed pursuant to [La. Code Crim. Proc.] art. 851(5) or whether it is applicable to ... motions filed pursuant to [La. Code Crim. Proc,] 851(1).” This Court, which was considering a motion for new trial based upon La. [Code Crim. Proc. art.] 851(1), wherein the verdict is allegedly contrary to the law and evidence, reviewed the evidence and concluded that the evidence supported the verdict. Collins, 10-1181, p. 12, 62 So.3d at 275. The Court stated that "even accepting arguendo that Guillory is applicable to the denial of a motion filed pursuant to [La. Code Crim. Proc.] 851(1), the trial court clearly did not abuse its discretion in denying the motion.” Id. at 18.